IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 3:19-cr-166-TJC-LLL |
| DAVID LANE BYRNS, | ) |
| Defendant. | ) |

**DEFENDANT DAVID BYRNS'S SENTENCING MEMORANDUM
AND MOTION FOR DOWNWARD VARIANCE**

COMES NOW Defendant David Byrns, by and through his attorney, and hereby files this Sentencing Memorandum to aid the Court in imposing a sentence which is sufficient but not greater than necessary to serve the objectives of sentencing, as reflected in 18 U.S.C. § 3553(a).

**I.      Introduction**

On October 29, 2019, David Byrns appeared before the Court, and entered a plea of guilty to a single count information, charging him with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349.  Mr. Byrns's plea was the result of negotiations with the federal government initiated by him, prior to any notification to him by any law enforcement entity that he was targeted for prosecution.  Without any prompting, in May, 2019, Mr. Byrns, through counsel, contacted counsel for the U.S. Department of Justice, Criminal Division, Fraud Section, and agreed to a series of meetings beginning on May 8, 2019.  Those meetings resulted in two appearances before a grand jury, indictments of several persons, and testimony at two separate trials resulting in convictions of other culpable individuals.

1

Through his plea, Mr. Byrns agreed to accept complete responsibility for his actions, and knows he will live the rest of his life with the consequences. Mr. Byrns has cooperated fully with the government in liquidating assets subject to forfeiture, to help satisfy his restitution obligation to the victims in this case should the government grant a petition for restoration made by the victims. The plea agreement (Doc. 12) permits Mr. Byrns to make a sentencing recommendation to the Court and does not forbid making a recommendation of a sentence outside of the calculated United States Sentencing Guideline range. (Doc.12, p. 19, ¶ 6). This Court is obviously free to impose any sentence authorized by law, including any sentence outside the applicable Guidelines Range that is not "unreasonable."

Through this memorandum, the Court will see that there are distinct and unique circumstances surrounding Mr. Byrns's actions leading to this conviction, and that his conduct represents an aberration in a life and career characterized by hard work, industry, an extraordinary commitment to his friends, family, and coworkers, and law-abiding behavior. The Court will also see that Mr. Byrns has had no problems complying with the conditions of his order of pretrial release.

While the advisory sentencing guidelines recommend a sentence of imprisonment, under *United States v. Booker*, 543 U.S. 220 (2005), *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007), the Court can and should vary from the guidelines and impose a sentence of probation. This memorandum will show why.

## II.     Standards for Imposing Sentence

As the U.S. Supreme Court established in *Booker*, *Gall*, and *Kimbrough*, a sentencing Court has broad discretion to consider nearly every aspect of a particular case (and a particular defendant) in fashioning an appropriate sentence. "It has been uniform and constant in the federal judicial

tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 552 U.S. at 52 (citing *Koon v. United States*, 518 U.S. 81, 113 (1996)). It is axiomatic that *Booker* rendered the U.S. Sentencing Guidelines ("Guidelines") advisory rather than mandatory. *Booker*, 543 U.S. at 264. And in *Gall*, the Supreme Court took pains to point out that 18 U.S.C. § 3553(a)(3) "directs the judge to consider sentences other than imprisonment." *Gall*, 552 U.S. at 59. The *Kimbrough* Court stressed that the sentencing judge is not bound by the Guidelines or Guidelines Policy Statements; rather, he may make his own policy judgments, even if those judgments are different than those provided for in the Guidelines. *Kimbrough*, 552 U.S. at 101. S*ee also*, *Spears v. United States*, 555 U.S. 261, 264-265 (2009).

The primary federal statutes governing sentencing in the federal district courts are 18 U.S.C. § 3553(a) and 18 U.S.C. § 3661. Under § 3553(a), the district court must impose a sentence that is sufficient, but not greater than necessary, to reflect the purposes of § 3553(a)(2), including the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, and to protect the public from further crimes of the defendant. *See United States v. McBride*, 2023 U.S. App. LEXIS 29065, ** 4-5 (11th Cir., November 2, 2023). Additionally, the court must consider, among other factors, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities among similarly situated defendants. *Id*. Indeed, this is "the overarching goal in federal sentencing." *Freeman v. United States*, 564 U.S. 522, 131 S.Ct. 2685, 2692 (2011).

Of crucial importance, 18 U.S.C. § 3661 makes it clear that "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Put simply, in addition to the § 3553(a) sentencing factors, the court may receive and consider *any* information concerning the defendant's background, character, and conduct in imposing a sentence. The Supreme Court highlighted the centrality of this concept: "[W]e have emphasized that '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.' Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" *Pepper v. United States*, 562 U.S., 131 S. Ct. 1229, 1240 (2011) (citations omitted).

### III. The History, Characteristics, Background, Character, and Conduct of David Byrns Justify a Downward Variance and Sentence of Probation.

A. David Byrns's Personal Experience, Good Character, and Works.

1. Early life.

Mr. Byrns was born in Munfordville, KY, a small rural town of around 1,500 people. Munfordville was a blue-collar town, with hardworking people. It was the kind of town where it was understood that when you graduated from high school, you were expected to enter the workforce. Opportunities to go to college were rare for kids from Munfordville. Mr. Byrns's father and grandfather were farmers, growing and selling tobacco as a money crop. Mr. Byrns's father also worked as a meter reader, and his mother worked as a key punch operator. From approximately age 8 through age 18, Mr. Byrns spent his weekends and summers helping his

4

grandfather on his tobacco farm. Mr. Byrns recalls plowing earth behind a mule team, cutting and bailing hay, and other chores necessary to run the farm.

Mr. Byrns lived with his parents and four brothers and sisters in a small home. It was a loving household. According to Mr. Byrns, "we weren't rich, but we got by. We had what we needed."

2. <u>Military service and post-secondary education.</u>

After graduating from high school, Mr. Byrns joined the Army National Guard, which began a ten-year period of serving either in the National Guard, active Army, or Army reserve. He worked as a wheel vehicle mechanic, and in the evenings, he attended night school at the University of Louisville. After seven years of work and study, he earned a Bachelor of Science in Business Administration in 1982.

During his military service, Mr. Byrns earned the Good Conduct Medal, the Humanitarian Service Medal, First Oakleaf Cluster to the State Active Duty Ribbon, and the Kentucky State Active Duty Ribbon. He earned an honorable discharge from the military.

3. <u>Early Employment History – Hospital Turnaround "the right way."</u>

Mr. Byrns took his first accounting job in Henrietta, Oklahoma, in 1986, where he worked at a small rural hospital for approximately a year and a half. The company that owned that hospital then transferred him to Pembroke Pines, Florida, to be a staff accountant at a large, 300-bed hospital. Eventually, he was promoted within the same company to become the controller of 7 rural hospitals across five states.

This experience led to Mr. Byrns being employed over the next two decades as a "turnaround specialist" at various distressed hospitals. Mr. Byrns would be appointed as a new CEO, COO, CFO, or CIO (or some combination of all four) at struggling hospitals, and his task was simple:

identify what problems were causing the hospital financial distress and fix those problems. Mr. Byrns would head up a turnaround team to develop and implement a strategic, financial, and operations plan, focusing on the delivery of high-quality patient care with the lowest possible overhead cost.  These tasks often involved finding new ways for the hospital to generate revenue, to include adding services, contracting with physicians with specific skills and privileges to bring in more patients, repairing infrastructure that caused underperformance in particular areas, and, above all, reducing overhead costs.  Over two decades, Mr. Byrns performed these services at various hospitals and hospital groups, to include Pam Springs General Hospital (10 years as CFO, COO, and CIO); South Shore Hospital in South Beach, Florida (1.5 years as CFO); South Cameron, Louisiana (CEO over two small rural hospitals); Minnie G. Boswell Hospital in Georgia (1 years as CEO and CFO), and many others.

Mr. Byrns observes that during these years he performed hospital turnaround services "the right way," and helped many different distressed hospital properties continue operating and forge a new path forward.

  4. <u>Mr. Byrns's struggles with alcohol, which helped fuel the offense conduct.</u>

Mr. Byrns had his first drink when he was sixteen years old.  He began drinking daily once he joined the military at age 17.  As Mr. Byrns said, "in the 1970's and 80's, drinking every day was just part of military culture."

Over time, Mr. Byrns began drinking alcoholically.  He believes that his alcoholic drinking probably began approximately two decades ago, in the early 2000's.  Mr. Byrns states that his alcoholic drinking clearly impacted his judgment, and caused him to "lose his moral compass," particularly from approximately 2015 forward, when he became associated with his co-conspirators in this case.

> 5. <u>Mr. Byrns withdraws from criminal conduct, proactively contacts the government to provide assistance, and consents to a judgment in the civil case against him</u>.

In 2018, Mr. Byrns was sued in a civil case in the United States District Court for the Western District of Missouri in relation to his time at Putnam County Memorial Hospital. (Case No. 5:18-cv-06037-DGK). After retaining the undersigned counsel in that action in April 2019, counsel became aware that there was a grand jury investigation involving Campbellton-Graceville Hospital. Without receiving direct contact from any law enforcement agency, and without being charged with any crime, Mr. Byrns authorized counsel to reach out to counsel for the Government in this case and offer to meet to discuss potential cooperation and a plea agreement involving Putnam County Memorial Hospital.

In early May 2019, the undersigned counsel called Assistant United States Attorney Gary Winter, counsel for the government in this case, and offered to meet with the government team in Fort Lauderdale, Florida, on May 8, 2019. This meeting ultimately led to Mr. Byrns's appearance before the Chief Magistrate Judge in the United States District Court for the Western District of Missouri on September 26, 2019, where he waived his right to prosecution by indictment, and consented to prosecution by information. The United States Attorney filed a single-count information against Mr. Byrns on the same day, charging him with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349. The information included an allegation of criminal forfeiture, all of which had been negotiated and agreed to by Mr. Byrns in the months leading up to the waiver of indictment.

Mr. Byrns consented to transfer of his criminal case to the United States District Court for the Middle District of Florida, to waive trial and enter a plea of guilty to the offense charged in the

information. On October 29, 2019, he pleaded guilty to one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349.

In his Plea Agreement, Mr. Byrns agreed to forfeit to the United States "immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture…" *Id*. at p. 9. Specifically, but without limitation, Mr. Byrns agreed to forfeit:

    a. David L. Byrns & spouse's Revocable Trust Yield Pledge Money Mark Account located at TIAA Bank, Account No. x3668, in the amount of approximately $1,846,038.89;

    b. David L. Byrns & spouse's Revocable Trust Yield Pledge Checking Account located at TIAA Bank, Account No. x2911, in the amount of approximately $94,694.98;

    c. Real property located at 4451 NE 27 Avenue, Lighthouse Point, Florida….

    d. Real property located at 2611 NE 52 Court, Lighthouse Point, Florida….

    e. Real property located at 1681 SE 4 Court, Deerfield Beach, Florida….

    f. Real property located at 1410 SE 14 Avenue, Deerfield Beach, Florida….

Mr. Byrns also agreed that he is "jointly and severally liable to make restitution to all victims of the offense, including but not limited to the following entities in the following amounts: RIGHT Choice Managed Care, Inc. $89,531,893…." Over the next several months, because of a cooperative and voluntary liquidation of Mr. Byrns' assets, various deposits were made into the Seized Asset Deposit Fund (SADF) in the following amounts:

    a. $1,854,802.03 from TIAA Bank;

    b. $94,863.58 from TIAA Bank;

  c. $547,821.83 from sale of real property at 4451 NE 27 Ave, Lighthouse Pt., FL;

  d. $406,899.87 from sale of real property at 1681 SW 14 Court, Deerfield Beach, FL;

  e. $416,886.35 from sale of real property at 2611 NE 52nd Ct., Lighthouse Point, FL;

  f. $456,342.89 from sale of real property at 1410 SE 14 Ave, Deerfield Beach, FL.

 Mr. Byrns then, over the next few years, testified twice before the grand jury, and twice in trials involving his co-conspirators. Mr. Byrns's cooperation with the Government led directly to the investigation, prosecution, and conviction of several culpable individuals, and forfeiture and restitution orders involving those same individuals.

 In December, 2022, Mr. Byrns received a windfall – a check in the mail in the amount of $16,889.87, relating to an old bankruptcy case that well predated his criminal activity in this case. Mr. Byrns, through counsel, immediately contacted the United States Attorney's office, and agreed to surrender the funds to the government, but requested that he be allowed to keep $5,000 to pay off credit card debt. The government agreed, and Mr. Byrns sent the USMS a check for $11,889.87.

 Unlike other defendants in the civil matter pending in the Western District of Missouri – who litigated one of the most contentious civil cases in recent memory in the district, resulting in sanctions against certain defendants and, extraordinarily, counsel for one of the defendants for their obstructive conduct – Mr. Byrns consented to summary judgment in that matter. (*See* Response Consenting to Summary Judgment, attached hereto as Ex. A).

 During the pendency of this criminal case – over a period of roughly four-and-a-half years – Mr. Byrns's stress and anxiety has taken a toll on his physical and mental well-being. He suffers

from emphysema and coronary/artery disease, hyperlipidemia, pulmonary nodules, and hypertension. He has recently had an exploratory procedure to determine whether a stent should be placed in his coronary artery, but it was determined that no stent was currently necessary.

Mr. Byrns has also experienced extreme and chronic emotional duress because he has been largely unable to obtain steady employment of any sort, due to the case and its outcomes being unresolved. Mr. Byrns is unemployable in positions which would allow him to provide for himself and his wife and will likely never be able to work in his chosen profession. These are significant collateral consequences which the Court should consider.

But perhaps most importantly, both before and after this case commenced, at all times during the protracted four-and-a-half-year period, Mr. Byrns did not violate the law. He has no prior criminal record, has been an upstanding citizen, and poses absolutely no threat of recidivism.

The victim in this case has submitted an impact statement, urging the Court to focus only on the offense conduct in this case, and to simply ignore Mr. Byrns's character, established professional history, and personal characteristics. But the Court cannot do so unless it is prepared to ignore federal sentencing law. The simple truth is that Mr. Byrns is a good person who has done many good things. While through his plea Mr. Byrns has acknowledged that he erred by committing the acts to which he has pled guilty, the Court must acknowledge the weight of his good deeds and character which persisted before and after the offense conduct, to properly and fairly "[weigh] the good with the bad." *United States v. Adelson*, 441 F. Supp.2d 506, 513-14 (SDNY 2006). It is obvious, based on his history – both before and after the offense conduct – that Mr. Byrns will continue to be an asset to the community and society if the Court grants him a probationary term. He is a perfect candidate for success on probation.

B.  <u>Mr. Byrns is a first-time offender, and his offense is atypical conduct.</u>

Mr. Byrns is a first-time offender. His life history is profoundly at odds with the offenses of conviction. A *Booker-Gall-Kimbrough* downward variance is therefore warranted based on atypical conduct. Moreover, as we have seen, being a first offender is in and of itself an appropriate basis for a downward variance, as several courts have recognized. *See, e.g., United States v. Huckins*, 529 F.3d at 1317 (10th Cir. 2008) (affirming that district court's downward variance of 60 to 79 months below the calculated Guidelines range was reasonable and permissibly took into account the Defendant's lack of a criminal record); *United States v. Munoz-Nava*, 524 F.3d at 1142-43 (10th Cir. 2008) (downward variance to one year imprisonment and one year home confinement from recommended Guidelines range of 65-78 months of imprisonment supported by district court's finding of several factors including that defendant had no felony criminal record and his offense was "highly out of character").

While repetitious or planned behavior does not qualify for an aberrant conduct downward departure under the now-advisory Guidelines regime, the Court is free to reject the Guidelines restriction and consider the atypical nature of Mr. Mader's conduct when deciding whether to downwardly vary under *Booker-Gall-Kimbrough*, if the Court articulates the reason for its decision. *United States v. Pinson*, 542 F.3d at 833 (10th Cir. 2008).

C.  <u>Mr. Byrns's alcoholism contributed to the offense conduct.</u>

The undersigned counsel will provide to the Court a letter from Mr. Byrns's physician, describing the toll that Mr. Byrns's addiction to alcohol has taken on him. Mr. Byrns does not offer this evidence as an excuse for his behavior but does offer it to give the Court some context as to how his judgment was impaired at the time of his offenses.

11

While alcohol and drug abuse addiction were traditionally improper considerations for a downward departure under the mandatory Guideline regime, it is no longer considered so under the advisory Guideline regime. *See, e.g., United States v. Garcia*, 497 F.3d 964, 971-72 (9th Cir. 2007) (remanding for reconsideration where court stated it could not consider defendant's addiction to drugs); *United States v. Cani*, 545 F. Supp. 2d 1235, 1243, 2008 U.S. Dist. LEXIS 11087 (M.D. Fla. 2008) ("there is no prohibition against factoring drug addiction into the § 3553 calculus. In fact, § 3553(a)(1) compels a sentencing court to take into account the history and characteristics of the defendant… For this reason, it is entirely appropriate to consider a defendant's drug addiction in fashioning an appropriate sentence."). Indeed, the Eighth Circuit affirmed a district court's decision to vary downward in a drug trafficking case from a Guideline range of 60 months to a sentence of probation, in part because of evidence that the defendant's "addiction to pain medication contributed to the criminal activity alleged in the indictment." *United States v. McFarlin*, 535 F.3d 808, 811 (8th Cir. 2008).

As outlined *supra*, Mr. Byrns's illegal conduct occurred over a slightly longer than two-year period, after a life and career otherwise marked by ambition, creativity and success. Mr. Byrns's crimes occurred in large measure due to his descent into alcohol abuse and addiction, and the resulting impact on his judgment. Mr. Byrns respectfully suggests that this factor, considered in conjunction with all others identified herein, merits the requested sentence of probation.

D. <u>Mr. Byrns's Family and Community Support.</u>

As the Court will see from the letters which are submitted on Mr. Byrns's behalf, attached hereto as Ex. B, he enjoys a strong base of family and community support. The family and emotional support that a defendant can be expected to receive from family and community members is another recognized basis for a downward variance. *United States v. Sayad*, 589 F.3d

1110, 1114-1115 (10th Cir. 2009); *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (family support one of several valid grounds for downward variance from 41-51 months to probation); *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008) (family support is one of three valid reasons for 91-month downward variance).

E.  Mr. Byrns's Strong History of Employment.

The lengthy summary of Mr. Byrns's strong and credible history of employment is set forth above and will not be repeated here. However, even while unable to find work in the hospital industry as a result of his plea of guilty in this case, Mr. Byrns has demonstrated his work ethic by engaging in self-employment as a handyman, falling back on the skills he learned in the armed forces. Here are some examples of Mr. Byrns's self-employed work:



*Deck teardown and rebuild, 2023.*



*Shower demolition, redesign, and rebuild, 2023.*

As the Court knows, steady and meaningful employment is one of the greatest measures of whether an individual is likely to be successful if granted a sentence of probation.

F.  Mr. Byrns's Family Circumstances Merit a Sentence of Probation.

Mr. Byrns's wife has an upcoming surgery which will require Mr. Byrns to care for her during the post-operative period. Moreover, Mrs. Byrns is on the verge of retiring from her career as a nurse, at age 70, and accordingly, the Byrns's household income will drop significantly.

If Mr. Byrns is sentenced to a term of incarceration, it would be not only a financial hardship upon this family, but also would deprive Mrs. Byrns of her primary source of care and support in dealing with her medical condition and financial circumstances.

**IV. The Nature and Circumstances of the Offense and Byrns's Substantial Post-Offense, Pre-Indictment Rehabilitation Call for a Sentence of Probation.**

This Court is familiar with the nature and circumstances of the offense, which are described in the presentence report. Simply put, after decades of doing things the "right way" in the hospital industry, Mr. Byrns lost his moral compass and engaged in the conduct that led him here today.

However, Mr. Byrns has demonstrated, since 2018, extraordinary post-offense rehabilitation, voluntary surrender of money and assets, confession of judgment in a civil case, and cooperation with the Government in the investigation and prosecution of other individuals. Without prompting, he contacted law enforcement, and gave proffers and testimony which resulted in the prosecution and conviction of other culpable individuals. Mr. Byrns admitted his guilt before this Court and stands ready to be sentenced.

This kind of post-offense, pre-indictment rehabilitation is precisely the basis for departure identified by the Court in *Gall v. United States*, 522 U.S. 38, 128 S.Ct. 586 (2007), wherein the Court affirmed the judgment of a district court granting a defendant a thirty-month downward variance and sentencing him to probation because of the defendant's voluntary withdrawal from a conspiracy, and post offense conduct showing that he would not return to criminal behavior, and that he was not a danger to society.

In *Gall*, the district court sentenced Brian Gall, a participant in an ecstasy distribution conspiracy, to a term of probation for thirty-six months, which was a downward variance from a Guideline range of thirty to thirty-seven months of imprisonment. *Id*. at 591-92. Gall had withdrawn from the conspiracy (from which he had netted $30,000 income) a few months after joining it, ceased selling or using illegal drugs of any kind, graduated from college, started a career, and otherwise lived a reputable life for the three-and-a-half years preceding his sentence. *Id*. at 591-92.

Applying the factors enumerated in § 3553(a), the district judge determined that a sentence of probation was "sufficient, but not greater than necessary to serve the purposes of sentencing," considering Gall's post-offense conduct, the support offered by his family and friends, his lack of any criminal history, and his age at the time of the offense conduct. *Id*. The district judge explained that a sentence of probation would reflect the seriousness of Gall's offense, while a prison term would deprive society of Gall's contributions despite evidence that Gall understood the consequences of his criminal conduct, posed little risk of recidivism, and would not be a danger to society. *Id*.

The Eighth Circuit reversed and remanded, holding that the variance granted to Gall was so substantial that it needed to be supported by extraordinary circumstances. *Id*. at 594. In a 7-2 decision, the Supreme Court reversed. The Court first rejected the Eighth circuit's rule that a so-called "extraordinary" variance from the Guidelines must be justified by "extraordinary" circumstances. *Id*. at 595. The Court also discredited the Eighth Circuit's rule that any non-prison sentence amounts to a "100% departure" from a Guidelines sentence, because that approach "gives no weight to the 'substantial restriction of freedom' involved in a term of supervised release or probation." *Id*. at 595-96.

The *Gall* Court then addressed the Eight Circuit's review of the district judge's § 3553(a) analysis, concluding that because the Court of Appeals gave virtually no deference to the district court's decision, the court engaged in an analysis that "more closely resembled de novo review of the facts presented and determined that, in its view, the degree of variance was not warranted." *Id*. at 600. The Court held that the district judge properly considered Gall's age, his early withdrawal from the conspiracy, and his efforts to rehabilitate himself as supporting a variance under several 3553(a) factors. *Id*. at 600-01.

In the wake of *Gall*, courts have affirmed countless substantial downward variances, many involving proof of post-offense rehabilitation. *See, e.g.*, *United States v. McFarlin*, 535 F.3d 808, 811 (8th Cir. 2008) (affirming downward variance in a drug trafficking case from a Guideline range of 60 months to a sentence of probation, in part because of evidence that the defendant's "addiction to pain medication contributed to the criminal activity alleged in the indictment," and because of evidence in the record concerning defendant's post-arrest rehabilitation); *United States v. McGhee*, 512 F.3d 1050, 1051-52 (8th Cir. 2008) (103-month downward variance); *United States v. Lehmann*, 513 F.3d 805, 807-08 (8th Cir. 2008)(37 month downward variance);

Here, there are significant similarities which make Mr. Byrns's case equally appropriate for a significant downward variance to a sentence of probation. Mr. Byrns, like Mr. Gall, voluntarily ceased criminal activity prior to any charges being filed, voluntarily surrendered money and assets to help make the victims whole, and voluntarily cooperated in the prosecution of others. Also, like Mr. Gall, Mr. Byrns manifested an early acceptance of responsibility at the earliest possible time – before even receiving any notice of investigation by the federal government, or having charges filed against him.

Here, as in *Gall*, no significant term of imprisonment is necessary to reflect the seriousness of Mr. Byrns's offense, in that a lengthy term of imprisonment "would be countereffective by depriving society of the contributions of the Defendant who … understands the consequences of his criminal conduct and is doing everything in his power to forge a new life." *Id*. at p. 593. Mr. Byrns's post offense conduct, like Mr. Gall's, "indicates neither that he will return to criminal behavior, nor that [he] is a danger to society." And finally, Mr. Byrns's post offense conduct between 2018 and the charges filed in this case, like Mr. Gall's, "was not

17

motivated by a desire to please the Court or any other Governmental agency but was the pre-Indictment product of the Defendant's own desire to lead a better life." *Id*.

Therefore, Mr. Byrns's substantial post-offense rehabilitation, considered in conjunction with the other § 3553(a) factors identified herein, merits a downward variance to sentence of probation.

**V.      Consideration of § 3553(a)(6) Calls for a Sentence of Probation.**

We now turn to 18 U.S.C. § 3553(a)(6), which directs that the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" be considered when imposing sentence. To this end, United States Sentencing Commission data shows the following:

- In Fiscal Year 2021, in cases involving theft, property destruction, and fraud, the average sentence length was 21 months. (Ex. C, p. 1). Of these cases, only 58.1% of offenders were sentenced under the Guideline Manual, and of those, only 69.2% were sentenced within the guideline range. (Ex. C, p. 2).
- 41.9% of theft and fraud offenders received a variance, of which 94.5% received a downward variance. (Ex. C, p. 2). The average sentence reduction was 59.6%.

Moreover, there are numerous examples in courts across the country where defendants charged or convicted of criminal tax and fraud-based violations with varying guideline recommendations were given sentences of probation. On July 30, 2020, this Court sentenced Steven Matthews – who was originally charged with attempting to evade or defeat tax, and willful failure to file returns – to a term of five years of probation with 120-day home confinement with work release. *See, e.g., United States v. Warner,* 792 F.3d 847, 857-65 (7th Cir. 2015) (defendant sentenced to two years probation after evading $5.6 million in U.S. taxes,

due in part to defendant's voluntary disclosure of criminal conduct without prompting, and voluntary payment of civil penalties); *United States v. Matthews*, United States District Court for the Western District of Missouri, Case No. 4:17-cr-00109-GAF-1 (district court sentenced defendant – who was originally charged with attempting to evade or defeat tax, and willful failure to file returns – to a term of five years of probation with 120-day home confinement with work release.); *United States v. Randall Barker*, United States District Court for the District of Kansas, Case No. 6:18-cr-10152-EFM-1 (defendant sentenced to one year of probation and order of restitution.).

These statistics show that Mr. Byrns's request for a downward variance to a sentence of probation is well within the realm of reasonableness, as the Courts are not generally reticent about giving below-guidelines sentences in theft and fraud cases, where the totality of the sentencing factors favor it.

## VI.    Conclusion

As he appears today, Mr. Byrns has shown the Court – nearly four years after the acts for which he has accepted responsibility – that he is worthy of the probationary sentence conferred on other similarly situated defendants. Such a result is just and appropriate. David Byrns, outside of prison, is a threat to no one.

Should the Court agree that a just, reasonable, and probationary sentence is appropriate, *Booker*, *Gall*, and *Kimbrough* allow this Court to impose probation. In fact, § 3553(a) *directs* that the sentencing court "*shall* impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes set forth in paragraph (2) of this subsection." (emphasis added). For the foregoing reasons, Mr. Byrns prays that this Court impose a sentence of probation in this case.

        Respectfully submitted:

        **JOHNSTON LAW FIRM LLC**

By:   */s/ J. Justin Johnston*
       J. Justin Johnston   MO #52252
       811 Grand Blvd., #101
       Kansas City, MO 64106
       Tel: (816) 739-4538
       Fax:  (816) 421-5403
       jjj@johnstonlawkc.com
       ***ATTORNEY FOR DEFENDANT***

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of December 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system for electronic delivery to all counsel of record.

      /s/ J. Justin Johnston
      ***Attorney for Defendant***